Francisco **Agulto**,
Plaintiff/Appellant, Cross-Appellee,

v.

**Northern Marianas
Investment Group, Ltd.**,
Defendant/Appellee, Cross-Appellant.
Appeal Nos. 92-021 & 92-024
Civil Action No. 91-1003
June 28, 1993

Argued and Submitted March 11, 1993

Counsel for appellant/cross-appellee: Reynaldo O. Yana, Saipan.

Counsel for appellee/cross-appellant: G. Anthony Long, Saipan.

BEFORE: DELA CRUZ, Chief Justice, VILLA-GOMEZ, Justice, and KOSACK, Special Judge.

VILLAGOMEZ, Justice:

Francisco Agulto ("Agulto") appeals a judgment entered against the defendant, Northern Marianas Investment Group, Ltd. ("NMIG"), for $12,500. He contends that the judgment should be $56,018.25, constituting his total winnings from playing on a poker machine operated by NMIG. NMIG also filed a cross-appeal. Based on our analysis below, we conclude that Agulto is entitled to the sum of $68,518.25, minus the $12,500 already paid him by NMIG.

## FACTUAL AND PROCEDURAL BACKGROUND

On August 1, 1991, Agulto played one of the poker machines at the Lucky Spot Game Room in Garapan operated by NMIG. One plays the poker machine using quarters. The player may lose his quarters or win points. Each point is equivalent to one quarter, i.e., twenty-five cents.

After playing for a while, Agulto accumulated 28,000 points, which he could "cash in" for 28,000 quarters. He instead bet 100 quarters and "hit" a royal flush, which garnered him 100,000 additional points. After hitting the royal flush, he pressed the "double" bet button and won 100,000 more points. He then continued playing and kept winning until an NMIG employee came and told him to stop playing on that particular machine because it had "malfunctioned." At that point, Agulto had accumulated a total of 274,473 points, as registered on the machine. He then pressed the "collect" button, and the machine paid him 400 quarters, the maximum number of quarters directly payable by the machine, leaving 274,073 quarters unpaid.

Until Agulto was told by the NMIG employee to stop playing, he did not know that the machine had "malfunctioned." Nothing indicated to him that the machine was operating abnormally or was otherwise defective.

When Agulto approached the Lucky Spot cashier to cash in the balance of his accumulated points, the cashier referred him to the manager. The manager, in turn, referred him to a special consultant for L&T.[1] The special consultant offered to pay Agulto only $12,500— the equivalent of 50,000 points. Agulto later reluctantly accepted the $12,500 from NMIG, but told the consultant that he would consult his attorney and try to collect the balance. Failing to collect the "balance," Agulto filed this suit.

At trial, NMIG presented evidence showing that the type of poker machine Agulto played has the capacity to accumulate a total of 10,000 points for small bets, at which point the machine should freeze, ring a bell, pay out 400 quarters to the player and instruct the player to claim the balance of his winnings from the shop attendant. In order for the machine to be played again, the attendant has to reset it.

A player on the same machine could bet up to 100 quarters in a single bet, and if a royal flush is hit, would win 100,000 points. When that happens, the machine should again freeze, ring a bell, pay out 400 quarters, and instruct the player to claim the balance of his winnings from the attendant. Again, the attendant must reset the machine before it can be replayed.

---

[1] L&T Corporation ("L&T"), another corporate entity, apparently owns the machines and employs certain of the workers in the game room.

An L&T employee testified that if the poker machine Agulto played continued to give out points over 10,000 for small bets, or did not freeze when a player won 100,000 points, then it had "malfunctioned." It is written on the machine itself that a malfunction voids all pays and plays. However, when or how the poker machine "malfunctions" is not defined either on the machine itself or anywhere in the game room. Agulto was not informed, in advance of playing, what constituted a "malfunction."

Based on the evidence, the trial court found that the poker machine Agulto played malfunctioned when it registered 28,000 points—18,000 points above the 10,000 point limit. However, the court found that the notice to players regarding voiding of all transactions upon a malfunction of the machine was inconspicuous and, therefore, ineffective.

The court concluded that Agulto was entitled to payment for a total of 100,000 points, the maximum amount he could win with a 100 bet royal flush, as if the machine had not malfunctioned. It did not make any finding or conclusion regarding Agulto's claim that NMIG violated the CNMI Consumer Protection Act. Similarly, the court did not grant Agulto's request for punitive damages and attorney's fees.

## ISSUES RAISED BY BOTH PARTIES AND STANDARD OF REVIEW

1. Is Agulto entitled to payment for (a) all 28,000 points he accumulated before "hitting" the 100 bet royal flush, and (b) for the second 100,000 points accumulated when he doubled his bet on the royal flush and won?
2. Did the trial court err in not finding NMIG in violation of the Consumer Protection Act?
3. Did the trial court err in not awarding Agulto punitive damages and attorney's fees under the Consumer Protection Act?
4. Is NMIG, as a matter of law, an agent of L&T?
5. Did the trial court err in awarding $12,500 to Agulto in view of the fact that the poker machine had malfunctioned?

Issues one, two, and three are raised by Agulto. Issues four and five are raised by NMIG on cross-appeal. All the issues either raise questions of law or involve mixed questions of fact and law, and are reviewed de novo. *See Rosario v. Quan*, 3 N.M.I. 269, 276 (1992); *see also Reyes v. Ebeteur*, 2 N.M.I. 418, 425 (1992) (violation of the Consumer Protection Act by specific act is a question of law); *Repeki v. MAC Homes (Saipan) Co., Ltd.*, 2 N.M.I. 33, 50-51 (1991) (agency).

## ANALYSIS

### A. The Malfunctioning of the Machine

Although the trial court found that the machine malfunctioned, it also found that the written notice on the machine was inconspicuous and ineffective. Therefore, the malfunction rule should not apply and its award to Agulto of payment for only 100,000 points and not all the points he accumulated was inconsistent with the finding of inconspicuousness. The trial court's award to Agulto should have been based on the applicability of the malfunction "rule" to the entire transaction, and not just part of it. If it applies, then Agulto should receive nothing. If it does not apply, then he should be compensated for his entire winnings.

Agulto agreed to play the poker machine for a chance to win more money. He also faced the risk of losing. NMIG agreed to pay Agulto for points registered on a functioning machine. These mutual agreements constituted a valid gambling contract, based upon aleatory promises,[2] into which the parties entered.[3]

The malfunction rule posted on the machine was an attempt to formulate a condition precedent to NMIG's duty to pay Agulto for any winnings registered on the machine. However, the court found the notice, i.e., the rule, to be inconspicuous and ineffective. Therefore, no condition precedent applied and NMIG must pay for Agulto's entire winnings. *Cf.* RESTATEMENT (SECOND) OF CONTRACTS § 225 (1981) ("[a]n event may be made a condition either by the agreement of the parties or by a term supplied by the court"); *see also id.* § 227(1).[4]

---

[2] An aleatory contract is one where a promise is conditioned upon "the occurrence of a fortuitous event," see generally RESTATEMENT (SECOND) OF CONTRACTS [hereinafter CONTRACTS] § 76 cmt. c (1981), of which gambling contracts are one. *See id.* § 379 cmt. a.

[3] Pursuant to 6 CMC § 3156(a)(2), "[t]he operation of poker amusement machines" such as that on which Agulto played is not proscribed by N.M.I. Const. art. XXI. Such machines require "an element of skill [and] are not gambling devices." 6 CMC § 3154. However, for purposes of determining the nature, validity and effect of the contract into which Agulto and NMIG entered, this Court will analyze it as if it were a "gambling" contract. "[O]ne gambles when [one] pays a price for a chance to obtain a prize," *State v. Pinball Machines*, 404 P.2d 923, 925 (Alaska 1965), even where there is an element of skill involved. *Id.* at 926.

[4] *Cf.* CONTRACTS, *supra* note 2, §§ 226, 227(1) ("In resolving doubts as to whether an event is made a condition of an obligor's duty, and as to the nature of such an event, an interpretation is preferred that will reduce the obligee's risk of

9

■ Agulto has raised another reason why the trial court's award of only 100,000 quarters was erroneous: he did not know, and had no reason to know, that the poker machine he was playing had "malfunctioned." He kept on betting more points thinking that he might win more quarters and risking those that he was betting. Neither on the poker machine nor in the game room did NMIG post any notice to the player of what constituted a malfunction.

Absent such notice, a player should not be prejudiced by a so-called machine "malfunction" of which only the owner of the machine and the establishment knows and where the player, while playing, has no reason to suspect that the machine has in fact malfunctioned. Neither at the stage where Agulto reached the first 10,000 points nor when he exceeded 100,000 points was there any indication that additional plays meant a malfunction, voiding points registered on the machine. The same is true for Agulto's doubling of the bet.

For the above reasons, the malfunction rule does not apply and may not void any of Agulto's winnings.

## B. Violation of the Consumer Protection Act

■ Agulto argues that NMIG violated the CNMI Consumer Protection Act ("Act"), specifically 4 CMC § 5105(m),[5] which provides that "[e]ngaging in any act or practice which is unfair or deceptive to the consumer" is unlawful. First, he argues that NMIG concealed from him and other poker players how a machine malfunctions. Second, NMIG refused to pay Agulto immediately and instead sent him to L&T. Third, NMIG initially denied that Agulto won 274,473 points. Finally, NMIG refused to pay Agulto on the basis that he did not accumulate the number of points he claimed. Later, during trial, NMIG changed its position and said that although Agulto accumulated 274,473 total points as registered on the machine, he was not entitled to any award because the machine had malfunctioned. For the reasons set forth below, we are not convinced that NMIG violated the Act.

We analyze each of his arguments separately and in the same order. First, whether NMIG concealed from poker players how a poker machine malfunctions is a question of fact which has not been determined below. We are not at liberty to make a finding of fact based on

---

forfeiture, unless the event is within the obligee's control or the circumstances indicate that he has assumed the risk").

[5] Agulto misstated the applicable section of the statute. Instead of 4 CMC § 5103, he meant 4 CMC § 5105.

counsel's argument. *See Olopai v. Fitial*, 3 N.M.I. 101, 106-08 (1992). The record on appeal does not conclusively establish that NMIG *concealed* such information. More telling, it does not make sense for NMIG to conceal this point, since to do so would be detrimental to NMIG.

Second, although NMIG refused to pay Agulto immediately upon his request for payment, there appears to be a reason for such refusal. The chief technician had advised the shop attendant (and subsequently the manager) that the machine had malfunctioned. Therefore, under the rules of the game as known to NMIG, all transactions were supposedly voided.

Third, although NMIG initially refused to acknowledge that Agulto had accumulated a total of 274,473 points, it subsequently agreed that such number of points was what he received as registered on the machine. Although NMIG did not immediately acknowledge the total accumulated points, it did not attempt to refute or object to it. Its employees simply were not certain of the correct number of points accumulated.

Finally, the trial court's finding that the machine had malfunctioned, as defined by NMIG, is supported by the evidence and is not clearly erroneous. Therefore, NMIG's assertion that it was not liable because the machine had malfunctioned did not violate 4 CMC § 5105(m). The fact that it initially denied that Agulto had won 274,473 points did not violate the Act for the reason set forth above.

Based on the foregoing, the trial court did not err in not finding that NMIG violated the Act.

## C. Punitive Damages and Attorney's Fees

Because the trial court did not err in not finding that NMIG violated the Act, Agulto is not entitled to either punitive damages or attorney's fees, pursuant to the Act.

## D. NMIG as an Agent of L&T

■ NMIG argues that, as a matter of law, NMIG is an agent of L&T for purposes of operating L&T's poker machines. Therefore, L&T and not NMIG is liable to Agulto.

"As a matter of law" means that there is no dispute that NMIG is an agent of L&T. However, Agulto disputes NMIG's assertion that NMIG is an agent of L&T. The parties' contradicting assertions raise a question of fact which has not been adjudicated below.

*See MAC Homes, supra*, 2 N.M.I. at 50-51.[6] We are not at liberty to make factual findings based only on counsel's argument and the record on appeal. *See Olopai, supra.*

This is an issue that should have been initiated and litigated below. We will not address it for the first time on appeal. *Ada v. Sablan*, 1 N.M.I. 415, 426 n.12 (1990) (*citing Camacho v. Northern Marianas Retirement Fund*, 1 N.M.I. 362, 372 (1990)).

**E. The Award of $12,500**

NMIG argues that "the court's finding that the machine malfunctioned precludes any award of damages to Agulto." Agulto counters that there was no malfunctioning, and even if there was, it was not known to Agulto—no meeting of the minds—and does not bind him. As we held earlier, the malfunction rule does not apply in this particular case because Agulto did not know and had no reason to know that the machine malfunctioned.

**CONCLUSION**

Based on the foregoing, we conclude that the trial court erred in awarding only $12,500 instead of Agulto's total winnings. We **VACATE** the judgment and **RE-MAND** the case to the trial court to enter judgment for Agulto for $56,018.25, which is $68,518.25 (equivalent to 274,073 points) less the $12,500 already paid.

---

[6] It is not clear from the record that the material facts which would go to the existence of an agency relationship are not in dispute; as such, we treat this as a question of fact. *See Repeki v. MAC Homes (Saipan) Co., Ltd.*, 2 N.M.I. 33, 50-51 (1991).